H. R. SIEMONSMA, Appellant, v. CHICAGO, MILWAUKEE & ST. PAUL RY. CO.

**Carriers of live stock:** CONTRACT FOR SPECIAL SERVICE: INVALIDITY. The agreement of a railway company with the shippers of live-stock that if the latter would get together, or induce others to join them, and furnish sufficient stock to fill ten cars or more the company would furnish a special train for its shipment from a point in Iowa to Chicago, at rates charged for transportation in regular trains, is in violation of the Interstate Commerce Act and void; and no recovery can be had for injury occasioned by its breach.

*Appeal from Sioux District Court.*—HON. DAVID MOULD, Judge.

THURSDAY, FEBRUARY 20, 1913.

FROM judgment on a directed verdict, the plaintiff appeals.—*Affirmed.*

*Gerrit Klay,* for appellant.

*Shull, Farnsworth, Sammis & Stilwill,* for appellee.

LADD, J.—The petition was in two counts. In the first plaintiff claimed damages because of unreasonable delay in the transportation of cattle from Rock Valley to Chicago, Ill. The evidence in support thereof was the same as that reviewed on the former appeal and held insufficient to sustain the allegation (*Siemonsma v. Railway,* 137 Iowa, 607), and therefore as to this issue, the verdict was rightly directed.

In the second count, plaintiff alleged that he, his brother, R. Siemonsma, and S. W. Van der Wonde entered into an oral agreement with defendant's agent that if they "would get together or induce others to join them and deliver live stock in sufficient numbers at one time to fill ten cars or more at Rock Valley, to defendant for transportation to Chicago, Ill., defendant would furnish a special train;" that, in pursuance of such agreement, they delivered to defendant in its cars intended therefor, July 3, 1905, two hundred and forty-three head of cattle for such transportation and to be sold at the Union Stockyards in Chicago, Ill., on July 5th following; that said cattle were loaded in fourteen cars at about 6 o'clock p. m. and train made up with engine attached and ready to start when they were required by the station agent to sign shipping contracts, which they did without reading and supposing the provision for special train was inserted therein; that, had said cattle been transported by special train, they would have reached the stockyards in time for the Wednesday, July 5th, market and before noon of that day; that instead defendant did not carry by special train, and as a consequence the cattle did not reach the stockyards until the morning of the next day, and, through shrinkage and fall of price, the shippers were damaged in the sum of $1,035, for which sum plaintiff, to whom R. Siemonsma and Van der Wonde have assigned their claims, prayed for judgment. The evidence disclosed that the special train left Rock Valley at 6:40 p. m., but when it reached Sanborn the cars were transferred to a regular freight train in which they were hauled to Chicago, Ill.; the cattle being unloaded for rest and feeding en route at Savannah, Ill. Whether there was an agreement to haul by special train beyond Sanborn was in dispute, but the jury might so have found, and that had a special train been furnished the entire way that the cattle would have reached the stockyards for Wednesday's market. If then the oral agreement was valid and was not superseded by the written contracts, it would seem that a case was made

out for the jury. The written contracts in no wise related to whether the cars should be hauled by special train, and it may well be doubted whether these, under the circumstances, should be construed to supersede or in any wise affect the alleged oral agreement.

But we prefer to put our decision on another ground, for that it finally disposes of the case, even though not suggested on the trial nor in this court save in oral agreement. The trial court held the oral agreement not binding on defendant because of the subsequent written contracts of shipment, and that the agreement, if made, was invalid, is only a better reason for a correct ruling.

The oral arrangement, if as alleged, was but a contract for a preference in the shipper's favor, a discrimination prohibited by the federal statutes in the clearest terms. By the third section of Interstate Commerce Act Feb. 4, 1887, chapter 104, 24 Stat. 379 (U. S. Comp. St. 1901, page 3156), it was made unlawful to give any undue or unreasonable "preference or advantage" to any particular person or to subject any particular person to "any undue or unreasonable prejudice or disadvantage in any respect whatever." Carriers like defendant are by the sixth section of the act to keep posted for public inspection printed schedules showing rates, charges, and classifications, and "any rules or regulations which in any wise change or affect or determine any part or the aggregate of such aforesaid rates and fares and charges." The same section also provides as follows: "And when any such common carrier shall have established and published its rates, fares and charges in compliance with the provisions of this section, it shall be unlawful for such common carrier to charge, demand, collect, or receive from any person or persons a greater or less compensation for the transportation of passengers or property, or for any services in connection therewith, than is specified in such published schedule of rates, fares, and charges as may at the time be in force."

By the act of February 19, 1903, known as the Elkins

act, amending the act of 1887 (32 Stat. 847, chapter 708 [U. S. Comp. St. Supp. 1911, page 1309]), it is made "unlawful for any person, persons, or corporation to offer, grant, or give, or to solicit, accept or receive, any rebate, concession, or discrimination in respect of the transportation of any property in interstate or foreign commerce by any common carrier subject to said act to regulate commerce and the acts amendatory thereto, whereby any such property shall, by any device whatever, be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by said act to regulate commerce and the acts amendatory thereto, or whereby any other advantage is given or discrimination is practiced." In speaking of this act, Mr. Justice White, in *New York, N. H. & H. R. Co. v. Interstate Commerce Commission*, 200 U. S. 361, 391 (26 Sup. Ct. 272, 277, 50 L. Ed. 515), said:

It cannot be challenged that the great purpose of the act to regulate commerce, while seeking to prevent unjust and unreasonable rates, was to secure equality of rates as to all, and to destroy favoritism, these last being accomplished by requiring the publication of tariffs, and by prohibiting secret departures from such tariffs, and forbidding rebates, preferences, and all other forms of undue discrimination. To this extent and for these purposes the statute was remedial, and is therefore entitled to receive that interpretation which reasonably accomplishes the great public purpose which it was enacted to subserve. That a carrier engaged in interstate commerce becomes subject as to such commerce to the commands of the statute, and may not set its provisions at naught, whatever otherwise may be its power when carrying on commerce not interstate in character, cannot in reason be denied.

The manifest purpose of these federal statutes was to compel the carrier, as a public agent, to give like treatment to all, and little argument would seem necessary to show that to an undertaking to carry one shipper's cattle by special train at the same rate or tariff exacted from another routed

on schedule time would be violative of the spirit as well as the letter of the law. The Supreme Court of the United States, however, has passed on the precise question now before us in *Chicago & Alton R. Co. v. Kirby*, 225 U. S. 155 (32 Sup. Ct. 648, 55 L. Ed. 1033). Kirby was engaged in shipping horses from Springfield, Ill., to New York City, and entered into a contract with the railroad company to carry a car load of horses at schedule rates from Springfield to Joliet in time to deliver the following morning so that it would be carried by the fast stock train known as the "horse special" over the M. C. Railroad through to New York. Connection was missed, and transportation delayed to the shipper's damage. In holding that the contract was invalid, the court, speaking through Lurton, J., said:

The implied agreement of a common carrier is to carry safely and deliver at destination within a reasonable time. It is otherwise when that action is for a breach of a contract to carry within a particular time, or to make a particular connection, or to carry by a particular train. The railroad company, by its contract, became liable for the consequence of a failure to transport according to its terms. Evidence of diligence would not excuse. If the action had been for the common-law carrier liability, evidence that there had been no unreasonable delay would be an answer. But the company, by entering into an agreement for expediting the shipment, came under a liability different and more burdensome than would exist to a shipper who made no such special contract. For such a special service and higher responsibility it might clearly exact a higher rate. But to do so, it must make and publish a rate open to all. This was not done. The shipper, it is also plain, was contracting for an advantage which was not extended to all others, both in the undertaking to carry so as to give him a particular expedited service, and a remedy for delay not due to negligence. An advantage accorded by special agreement, which affects the value of the service to the shipper and its cost to the carrier, should be published in the tariffs; and for a breach of such a contract relief will be denied, because its allowance, without such publication, is a violation of the act. It is also illegal because it is an un-

due advantage in that it is not one open to all others in the same situation.

See, also, *Winn v. American Express Co.,* 149 Iowa, 259.

This reasoning seems unanswerable, and it necessarily follows that the oral agreement is invalid, and that recovery might not be had for any injury occasioned by its breach. The verdict for defendant was rightly directed.—*Affirmed.*