HEILMAN & CLARK, Appellees, v. CHICAGO & NORTHWESTERN RY. Co., Appellant.

**Carriers:** INTERSTATE SHIPMENT: REGULATION. An interstate shipment 1 of property is governed by the regulations imposed by Congress; and the state statute providing that no contract, receipt or rule shall exempt the carrier from any liability which would exist in the absence of such agreement or rule has no application.

**Same:** CONTRACTS OF SHIPMENT: RATES: VALUE IN CASE OF LOSS. 2 Where an interstate carrier has regularly filed a tariff of rates, showing different rates upon the same commodity, based upon different valuations, the schedule of rates becomes a part of the contract of shipment, and automatically fixes the rate when the value is specified in the contract; and where a shipper agrees to a certain valuation for the purpose of securing the lower rate he is bound by the value so fixed in case of loss.

**Same:** CONTRACT OF SHIPMENT: CONSIDERATION: EVIDENCE. Where
3 both plaintiff and defendant pleaded the contract of interstate ship-
ment, which fixed the value of the property for the purposes of ship-
ment, and provided that the recovery in case of loss should not be
greater than the stipulated value upon which the rate of shipment.
was based, it was competent for the defendant to show the consid-
eration for the contract, and for that purpose the tariff and schedule
of rates was receivable in evidence.

**Same:** SHIPMENT OF LIVE STOCK: NEGLIGENCE: EVIDENCE. Where a
4 contract for the interstate shipment of hogs provided that the ship-
per should prepare and bed the car, and there was an issue as to
whether a number of the hogs died in transit because of plaintiff's
negligence in preparing the car, or because of the negligence of
defendant in failing to properly water them, evidence of the man-
ner of preparation of the other cars in which hogs were shipped in
the same train, and which received the same treatment, none of
which died, was admissible.

*Appeal from Ida District Court.*—HON. F. M. POWERS, Judge.

SATURDAY, NOVEMBER 21, 1914.

ACTION to recover for the death of certain hogs shipped
on defendant's road under a written contract of shipment
in which the value of the hogs was stated, for the purpose of
securing a lower rate of tariff on the shipment. Verdict and
judgment for the plaintiff for the full value of the hogs lost.
Defendant appeals.—*Reversed* and *Remanded.*

*Johnston Bros.,* and *James C. Davis* and *George E. Hise,*
for appellant.

*Stiles & Devaney, C. L. Nichols* and *M. M. White,* for
appellee.

GAYNOR, J.—Plaintiff filed his petition in this suit on the
2d day of February, 1912, and therein claims: That on or
about the 1st day of July, 1911, he delivered to the defend-
ant at Arthur, Iowa, sixty-two head of hogs to be transported

over its lines, as a common carrier, to the Union Stockyards at Chicago, Ill. That the hogs, when delivered to and received by the defendant, were in good health and in first-class shipping condition. That the hogs so shipped constituted a car load, and were shipped in car No. 17975. That, at the time they were received and accepted by the defendant, the defendant, for a valuable consideration, executed and delivered to the plaintiff a bill of lading or shipping receipt providing for the transporting of said shipment over its line of railway, and with all connecting carriers, promptly, with due care, and within a reasonable time, to the Union Stockyards. That thereby the defendant became liable to the plaintiff, as the holder and owner of said bill of lading, for any loss or damage or injury to said shipment as might be negligently, carelessly, or wrongfully caused by the defendant while in its possession or in the possession of the connecting carriers. That, in transporting said hogs from Arthur, Iowa, to the Union Stockyards, the defendant neglected to properly water the hogs, and otherwise so negligently and carelessly handled said shipment that forty-eight of the hogs so delivered to it died while in transportation, and immediately after being loaded.

On the 9th day of December, 1912, the plaintiff filed the following amendment: ''There was no caretaker with the stock mentioned in the petition''—and attached a copy of the bill of lading referred to, which, so far as material, is as follows:

Liability limited to the declared valuation by shippers, but not exceeding the following:

| | |
|---|---|
| Each horse or pony (gelding, mare or stallion, mule or jack) | $100 00 |
| Each ox or bull | 50 00 |
| Each cow, steer, or yearling | 30 00 |
| Each calf | 10 00 |
| Each hog | 10 00 |
| Each sheep or goat | 3 00 |

Agents are not permitted to receive or ship animals of a higher value than as stated above, unless by special agreement noted hereon and a proper contract or release is signed by the owner or shipper thereof. And it is agreed between the owner and shipper of these animals and the said railroad company that in case of accident resulting in injury to said animals, the value thereof shall in no case exceed the valuation named above.

Shipments of live stock in car loads or less than car loads, will only be taken at the rates named herein, after this contract or agreement shall have been signed by the company's station agent and the owner or shipper, by which it is agreed and understood that such owner or shipper shall load, feed, water, and take care of such stock at his own expense and risk, and will assume all risk of injury or damage that the animals may do themselves or each other or which may arise by delay of trains.

To this petition the defendant interposed a general denial, admitting, however, that it received the car load of hogs for transportation from Arthur, Iowa, to the Chicago Stockyards; that they were received in pursuance of a contract set out in plaintiff's amendment to this petition, and makes said contract a part of the answer. Defendant alleges further that it was the duty of the plaintiff, under said contract, to load, feed, and water and care for said hogs and to prepare the car for receiving the same; that the plaintiff assumed the said duty and took charge of and placed the hogs in the car, but failed to properly bed and prepare said car for shipment. Defendant further says, that if said hogs died in transit, their death was the result of the negligence of the plaintiff in failing to properly care for, feed, water, and protect the said hogs prior to their being loaded in its car, and further says that their death, if any died, was due to an inherent weakness of the hogs themselves, and because of the negligence of the plaintiff in failing to properly prepare the car for receiving the hogs. Defendant further says that the hogs were in a weakened condition when placed in the car, and their death was due to such weakness and unfit condition for transportation,

and that their death, if any, was without any fault or negligence on the part of defendant.

Upon the issues thus tendered, the cause was tried to a jury, and a verdict returned in favor of the plaintiff for the fair and reasonable market value of the hogs shown to have died during transportation or immediately upon delivery in Chicago. Upon the judgment, a verdict was rendered for the plaintiff.

After a careful examination of the record in this case, we are of the opinion that the verdict of the jury upon the record actually made should be permitted to stand, and, unless the court erred in the making of the record in the following particulars, the verdict and judgment ought not to be disturbed: (1) In its analysis of the issues actually tendered by the parties, upon which the controversy should be presented to the jury. (2) In the rejection of testimony offered by the defendant in support of the issue, which it claims was tendered by the pleadings. (3) In the rejection of testimony claimed to support the allegations of the answer that the loss complained of by the plaintiff was due to the negligence of the plaintiff, as set out in the answer. (4) In the refusal to give instructions asked by the defendant, and in submitting instructions to the jury on its own motion.

As to the first proposition above stated, it seems to be the contention of the plaintiff that the action is a common law for tort, for a breach of the common-law duties of the defendant as a common carrier; that the plaintiff had a right to and did ignore the contract, and the provisions of the tariff and the federal statute governing shipments of this kind.

The contention of the defendant, however, is that the release valuation provided for in the contract was made to secure the lower rate in the official tariff; that the tariff rate for transportation was based on such valuation; that the consideration for the released valuation in the contract was the tariff rate fixed for such shipments, which became and was, as a matter of law, a part of the contract; that, in so far as it provides

for a certain fixed valuation of the property shipped, it is not intended to and does not change the nature of the undertaking of the common carrier, or limit its obligation in the care and management of that which is entrusted to it. It rather defines the subject-matter of the contract, fixes the value of the thing which the carrier is required under the law to transport, and for which he must account in the performance of his duty as a carrier; and it is claimed it does not exempt him from liability for damage, loss, or injury to the property, but simply determines the value of the thing for which the common carrier must account in case of loss or injury to the thing shipped, and fixes the compensation to be received by the carrier for the risk assumed. This question is considered in *Graves v. Lake Shore & M. S. R. Co.*, 137 Mass. 33, reported in 50 Am. Rep. 282, in which it is said:

It is the right of the carrier to require good faith on the part of those persons who deliver goods to be carried or enter into contracts with him. The care to be exercised in transporting property and the reasonable compensation for its carriage depend largely on its nature and value. . . . It is just and reasonable that a carrier should base his rate of compensation, to some extent, upon the value of the goods carried; this measures his risks, and is an important element in fixing his compensation. If a person voluntarily represents and agrees that the goods delivered to a carrier are of a certain value, and the carrier is thereby induced to grant him a reduced rate of compensation for the carriage, such person ought to be barred by his representation and agreement. Otherwise he imposes upon the carrier the obligations of a contract different from that into which he has entered.

In *Gibbon v. Paynton*, 4 Burr. 2298, Lord Mansfield said, speaking of the duties of common carriers and their rights:

His warranty and insurance is in respect to the reward he is to receive and the reward ought to be in proportion to the risk.

In *Kansas City S. R. Co. v. Carl*, 227 U. S. 645 (33 Sup. Ct. 394, 57 L. Ed. 683), Judge Lurton, speaking for the court, said:

A declared value by the shipper for the purpose of determining the applicable rate, when the rates are based upon valuation, is not an exemption from any part of its statutory or common-law liability. The right of the carrier to base rates upon value has been always regarded as just and reasonable. The principle that the compensation should bear a reasonable relation to the risk and responsibility assumed is the settled rule of common law. . . . The right of the carrier to adjust the rate to the valuation which the shipper places upon the thing to be transported is the very basis upon which a limitation of liability in case of loss or damage is rested. This is an administrative principle in rate making, recognized as reasonable by the Interstate Commerce Commission, and is the basis upon which many tariffs filed with the Commission are made. . . . It follows, therefore, that, when the carrier has filed rate sheets which show two rates based upon valuation upon a particular class of traffic, it is legally bound to apply that rate which corresponds to the valuation. If the shipper desires the lower rate, he should disclose the valuation. . . . But when a shipper delivers a package for shipment and declares a value, either upon request or voluntarily, and the carrier makes a rate accordingly, the shipper is estopped, upon plain principles of justice, from recovering, in case of loss or damage, any greater amount. The same principle applies if the value be declared in the form of a contract. If such a valuation be made in good faith, for the purpose of obtaining the lower rate applicable to a shipment of the declared value, there is no exemption from carrier liability due to negligence forbidden by the statute, when the shipper is limited to a recovery of the value so declared. . . . The valuation declared or agreed upon, as evidenced by the contract of shipment upon which the published tariff rate is applied, must be conclusive, in an action to recover, for loss or damage, a greater sum. In saying this we lay on one side, as not here involved, every question which might arise when it is shown that the carrier intentionally connived with the shipper to give him an illegal rate, thereby causing a discrimination or preference forbidden by the

positive terms of the act of Congress and made punishable as a crime. To permit such a declared value to be overthrown by evidence aliunde the contract, for the purpose of enabling the shipper to obtain a recovery in a suit for loss or damage in excess of the maximum valuation thus fixed, would both encourage and reward undervaluations and bring about preferences and discriminations forbidden by the law. Such a result would neither be just nor conducive to sound morals or wise policies. The valuation the shipper declares determines the legal rate, where there are two rates based upon valuation. He must take notice of the rate applicable, and actual want of knowledge is no excuse. The rate, when made out and filed, is notice, and its effect is not lost, although it is not actually posted in the station. . . . It would open a wide door to fraud and destroy the uniform operation of the published tariff rate sheets. When there are two published rates, based upon differences in value, the legal rate automatically attaches itself to the declared or agreed value. Neither the intentional nor accidental misstatement of the applicable published rate will bind the carrier or shipper. The lawful rate is that which the carrier must exact and that which the shipper must pay. The shipper's knowledge of the lawful rate is conclusively presumed, and the carrier may not be required to surrender the goods carried upon the payment of the rate paid, if that was less than the lawful rate, until the full legal rate has been paid.

See, also, *Missouri, K. & T. Ry. Co. v. Harriman Bros.,* reported in 227 U. S. 657 (33 Sup. Ct. 397, 57 L. Ed. 690), in which it is said:

It is not unreasonable, for the purpose of graduating freight according to value, to divide the particular subject of transportation into two classes: those above and those below a fixed maximum amount. No other method is practical, and this is the method administratively approved by the Commerce Commission. That the value of the cattle shipped under this valuation did greatly exceed the valuation therein represented may be true. It only serves to show that the shipper obtained a lower rate than he was lawfully entitled to have by a misrepresentation. It is neither just nor equitable that he shall benefit by the lower rate, and then recover for a value

which he said did not exist, in order to obtain that rate. Having obtained a rate based upon the declared value, he is concluded, and there is no room for parol evidence to show otherwise.

Citing *Hart v. Pennsylvania Ry. Co.*, 112 U. S. 331 (5 Sup. Ct. 151, 28 L. Ed. 717), and *Kansas City Ry. Co. v. Carl, supra*.

It is further said in that case:

When the carrier graduates its rates by value and has filed its tariffs showing two rates applicable to a particular commodity or class of articles, based upon a difference in valuation, the shipper must take notice, for the valuation automatically determines which of the rates is the lawful rate. If he knowingly discloses an undervaluation, for the purpose of obtaining the lower of two published rates, he thereby obtains an advantage and causes a discrimination forbidden and made unlawful by the first section of the Elkins Act of February 19, 1903 (32 Stat. 847, chapter 708 [U. S. Comp. St. Supp. 1911, page 1309]).

See, also, *Chicago, R. I. & P. Ry. Co. v. Cramer*, 232 U. S. 490 (34 Sup. Ct. 383, 58 L. Ed. 697).

In this last case it was said:

That rule of liability is to be enforced in the light of the fact that the provisions of the tariff enter into and form a part of the contract of shipment, and if a regularly filed tariff offers two rates, based on value, and the goods are forwarded at the low value in order to secure the low rate, then the carrier may avail itself of that valuation, when sued for. . . . damage to the property.

It must be borne in mind, in considering this question, that the shipment here under consideration was an interstate shipment, and subject, therefore, to any regulations imposed by Congress, and that therefore section 2074 of the Code of Iowa does not apply.

1. CARRIERS: interstate shipment: regulations.

In *Hart v. Pennsylvania Ry. Co., supra,* it is said:

It must be presumed from the terms of the bill of lading, and without any evidence on the subject, and especially in the absence of any evidence to the contrary, that, as the rate of freight expressed is said to be upon the condition that the defendant assumes a liability to the extent of the agreed valuation named, the rate of freight is graduated by the valuation. Especially is this so as the bill of lading is what its heading states it to be, 'a limited liability live stock contract,' and is confined to live stock. . . . The presumption is conclusive that, if the liability had been assumed on a valuation as great as that now alleged, a higher rate of freight would have been charged. The rate of freight is indissolubly bound up with the valuation. If the rate of freight named was the only one offered by the defendant, it was because it was a rate measured by the valuation expressed. If the valuation was fixed at that expressed, when the real value was larger, it was because the rate of freight named was measured by the law valuation. The plaintiff cannot claim a higher valuation, on the agreed rate of freight. . . . A distinction is sought to be drawn between a case where a shipper, on requirement, states the value of the property, and a rate of freight is fixed accordingly, and the present case. It is said that while in the former case the shipper may be confined to the value he so fixed, in the event of a loss by negligence, the same rule does not apply to a case where the valuation inserted in the contract is not a valuation previously named by the shipper. But we see no sound reason for this distinction. The valuation named was the 'agreed valuation,' the one on which the minds of the parties met, however it came to be fixed, and the rate of freight was based on that valuation, and was fixed on condition that such was the valuation, and that the liability should go to that extent and no further.

In the case at bar, the defendant, in support of its contention, offered to introduce in evidence its official tariff and schedule rates and charges duly and legally on file and in force upon its railway and governing shipments of live stock, including hogs, from Arthur, Iowa, to Chicago, Ill., on the date in question, which so far as material to this controversy, is as follows:

2. SAME: contracts of shipment: rates: value in case of loss.

Ratings given below are based upon values declared by shippers, not exceeding the following, under contract:

Each horse or pony (gelding, mare or stallion, mule or
    jack) .........................................$100 00
Each colt (under one year)........................ 50 00
Each ox, bull, or steer............................ 50 00
Each cow ........................................ 30 00
Each calf ....................................... 10 00
Each hog ........................................ 10 00
Each sheep or goat .............................. 3 00

Where the declared value exceeds the above, an addition of 25 per cent. will be made to the rate per 100 pounds or car for each 100 per cent., or fraction thereof, of additional declared value per head, animals exceeding in value $800 per head, or when no value is given, will be taken only by special arrangement. Live stock in car loads (limited liability for each animal under contract at values stated above). It should be understood, in receiving live stock of any description for transportation, that the consignor and consignee load and unload the same.

This offer was objected to, and the objection sustained. We assume that this ruling of the court was based upon the thought that the offer was not relevant to the issues tendered. But an examination of the pleadings shows that the plaintiff alleged that the defendant is a common carrier; that it received and accepted the hogs in controversy for shipment from Arthur to the Chicago Stockyards, and executed, issued, and delivered to the plaintiff a true bill of lading or shipping receipt for a valuable consideration, and under said bill of lading or shipping receipt undertook to transport the hogs in question to their destination, and that by reason thereof it became indebted to the owner of said bill of lading for the damages complained of, and attached to this petition a copy of the bill of lading, its live stock contract, signed by plaintiff and defendant, in which we find the following language:

Liability limited to the declared valuation by shipper, but not exceeding the following: 'Each hog, $10.' Agents

are not permitted to receive or ship animals of a higher value than as stated above, unless by special agreement noted thereon, and a proper contract or release is signed by the owner or shipper, and it is agreed between the owner and shipper of these animals and the said railway company that in case of accident, resulting in injury to said animals, the value thereof shall in no case exceed the value above named.

It appears, from the tariff sheet offered, that the defendant company based its shipping rates on valuation; that it had two rates on live stock: One based on the fixed valuation, and an additional rate of 25 per cent. made to that rate per 100 pounds for each 100 per cent. or fraction thereof.

It appears that in the contract the declared value of the hogs in controversy was not to exceed $10 each. The tariff rate fixed, therefore, automatically attached to and became a part of this contract. This rate the shipper was bound to know, and it must be conclusively presumed that he paid the rate provided in the tariff sheet upon that valuation. He therefore, by fixing a value not to exceed $10 on each hog, fixed the rate which the company had a right to charge for the risk assumed in transportation, and agreed that, in case of loss, it should not be liable for more than this amount.

The contract, fixing the valuation, fixed the rate which the company had a right to charge under the law, and it must be presumed that that is the rate paid by the shipper, in the absence of any proof to the contrary, and, having fixed a valuation on his property for the purpose of securing the lower rate, he cannot be heard to say that the value was greater than that fixed in the contract. As said in *Chicago, R. I. & P. Ry. Co. v. Cramer, supra:*

That rule of liability is to be enforced in the light of the fact that the provisions of the tariff enter into and form a part of the contract of shipment, and if a regularly filed tariff offers two rates, based on value, and the goods are forwarded at the low value in order to secure the low rate, then the

carrier may avail itself of that valuation, when sued for
.  .  .  damages to the property.

The contract fixes the value, and the rate to be charged
for the shipment is thereby fixed and, as said, automatically
attaches to the valuation.  There was no necessity, therefore,
of pleading the tariff rates or the law.  The tariff rates having
been filed as required by the statute became a part of the
contract and a limitation upon the rights of the company in
fixing the charges for the particular shipment, and evidence
therefore is not competent to show a value other and different
than that fixed in the contract, which was a basis for the rates
charged.  In fixing rates on valuations, the rate is based upon
the assumed liability of the carrier to the extent of the agreed
valuation.

In *Missouri, K. & T. Ry. Co. v. Harriman Bros., supra,*
it is said:

When the carrier graduates its rates by value and has
filed its tariffs showing two rates applicable to a particular
commodity or class of articles, based upon a difference in
valuation, the shipper must take notice, for the valuation auto-
matically determines which of the rates is the lawful rate.

It therefore follows that if the shipper agrees in his con-
tract to a certain valuation of his property, for the purpose
of securing the lower of two published rates, he is bound by
the valuation so fixed, in case of loss.  Otherwise he would be
able to secure a lower rate upon his shipment than provided
for in the tariff, and require the company, at the same time,
to assume the burden incident to the higher rate, and thereby
bring about that discrimination which is forbidden by the law,
and make wholly ineffectual and inoperative the acts of Con-
gress forbidding discrimination and rebates, indirectly secur-
ing to himself that which the law forbids the carrier to grant.

Both the plaintiff and defendant plead the contract under
which this shipment was made.  This contract fixed the value

of the property shipped for the purpose of shipment, and the

**3. SAME: contract of shipment: consideration: evidence.** plaintiff stipulated that, in case of loss, the recovery should not be greater than the stipulated value. The consideration for the valuation was the tariff rate fixed by the company for transporting live stock of the value fixed. Both parties having pleaded the contract, it was competent for the defendant to show the consideration for the contract, and defendant was therefore entitled to introduce the tariff and schedule of rates fixed by the company and on file, as required by the act of Congress, and, in refusing this, we think the court erred, and further so in allowing the plaintiff to recover any amount in excess of the valuation fixed by the contract.

It is next complained by the defendant that the plaintiff negligently bedded the car with dry chaff and straw, and negligently failed to wet the same down, either before or after

**4. SAME: shipment of live stock: negligence: evidence.** loading the hogs therein, that forty-four of said hogs died in transit; and, the plaintiff having alleged a claim in their petition that the hogs died by reason of defendant's negligent acts in not properly watering the same in transit, it was error for the court to exclude evidence offered by the defendant to show how twenty other cars of hogs on the same train were prepared and bedded, loaded, and wet down, especially where the hogs in such other twenty cars were carried in the same train with the plaintiff's hogs, and, the evidence tended to show, received identically the same care and treatment and handling and watering that the plaintiff's hogs received, and that none of the hogs in the other twenty cars died or were injured or damaged in transit.

The court, however, adopted the theory that such evidence did not tend to show that the plaintiffs were guilty of negligence in the manner in which their car was bedded and watered down. The court permitted the witnesses to testify as to the usual, customary, and ordinary way for bedding and loading cars for shipment to Chicago in hot weather, and

allowed the witnesses to testify as to how the plaintiffs bedded this particular car and watered it down, and left it to the jury to say whether or not the plaintiffs, in the manner in which they bedded this car and wet it down, exercised such care as men, engaged in like business, usually and ordinarily exercised in respect to the same matter, under like conditions, and whether or not the death of these hogs was attributable to the negligence of the plaintiffs in the manner in which they bedded these hogs.

The ultimate question for the jury to determine was whether or not the plaintiffs were guilty of negligence in respect to these matters which contributed to the death of these hogs. Under the contract, it was the duty of the plaintiffs to prepare the car for the hogs, and to load the hogs and get them ready for shipment. If a failure to perform this duty was the cause of the death of the hogs, the court told the jury the plaintiff could not recover. The court in its fifth, sixth, and seventh instructions to the jury said:

If you find from the evidence that plaintiffs' hogs were injured and died while they were being transported upon defendant's train, and that the death of said hogs was not due to the fact, if it be a fact, that plaintiffs had not properly prepared the car for loading, or that the hogs were weakened on account of their condition previous to loading, then the plaintiffs have made a prima facie case, and the burden will be upon the defendant to prove that care and skill on its part would not have prevented the injury.

If you find from the evidence that the death of said hogs was caused by the plaintiffs' negligence in not properly preparing the car in which they were loaded, or if the hogs were in a weakened condition at the time of loading, and that the injury and death of said hogs were occasioned either by the said negligent acts of the plaintiff or the inherent weakness of the hogs, or that the plaintiffs were guilty of negligence on their part in failing to wet down or water the hogs, then the plaintiffs cannot recover.

But if you find by a preponderance of the evidence that the car was properly prepared for loading, and that the hogs in question were properly loaded therein, and that they had no

inherent weakness, and were in good shipping condition, and that the hogs, or some of them, became sick and died before reaching their destination because they were not properly watered by defendant's employees while being transported from Arthur to Chicago, then you should find for plaintiffs.

The defendant offered to show that a car load of hogs from the same neighborhood from which plaintiffs came, and of like general character, were loaded in another car and shipped on this same train with plaintiffs' hogs, and that they reached their destination in good condition, and then offered to show the manner in which these hogs in this other car were loaded and bedded, and this was offered for the purpose of suggesting a theory upon which the jury might find from the circumstance that the death of the hogs in plaintiffs' car was due to the manner of bedding rather than to the treatment received from the defendant during transportation. Defendant's testimony tended to show that these hogs in controversy received exactly the same treatment that the hogs in the other cars on the same train received, which went through without injury.

There is no question but what these hogs died; that they died from some cause. It was for the jury to investigate and determine, under the issues tendered, what the cause was; who was responsible for the cause that produced the death. The plaintiffs claim that it was defendant's negligence in failing to properly water the hogs. Defendant claims it was the negligence of the plaintiffs in failing to properly bed the hogs. Now it would seem clear that, as a circumstance bearing upon these issues, it was competent for the defendant to show, not only how the plaintiffs' hogs were bedded, but to also show that they received the same treatment that other hogs, differently bedded on the same train, received, and that these other hogs, differently bedded, under the same conditions, and with the same treatment, so far as the defendant was concerned, survived the journey; and the offered testimony would have probative force on the question as to what was the cause of the

death of plaintiffs' hogs. Of course it would not be controlling, but would be a circumstance entitled to some weight, at least, in determining the ultimate question.

Suppose that the evidence disclosed that the plaintiffs did not bed their hogs at all, and that their hogs died, and they complained that the death was the result of the negligence of the defendant, and it should be shown that in the same train, loaded at the same place and at the same time, there were other car loads of hogs that were properly bedded for shipment, and that none of these hogs died, though receiving no better treatment during the shipping, so far as the defendant was concerned, than the plaintiffs' hogs received, would not it be at least a circumstance tending to show that the death was due rather to the want of bedding than to the treatment received at the hands of the defendant?

The court said to the jury (and this is the law of the case, so far as the plaintiffs were concerned):

If the death of the hogs was caused by plaintiffs' negligence in not properly preparing the car in which they were loaded, or if the plaintiffs were guilty of negligence in failing to wet down or water the hogs, then the plaintiffs cannot recover.

We think the evidence offered should have been admitted as a circumstance bearing upon the ultimate question as to what caused the death of these hogs. Of course it ought to be confined to time and place and conditions the same as those under which plaintiffs' hogs were shipped.

There are other complaints made by defendant and errors assigned, but as they do not touch the merits of this controversy, and are not likely to occur upon a retrial, or have been disposed of by prior decisions, we do not deem it necessary to enter into a discussion of them. We would say, however, in passing, that the better practice is not to state any issue, though presented in the pleading, which has no support in the evidence, and the practice of stating all the grounds for negli-

gence charged, and then withdrawing those which have no support in the evidence, though not a reversible error, is not to be commended. The proper method is to state only the issues upon which the jury are required to pass.

For the errors pointed out, the case is reversed and remanded.

*Reversed* and *Remanded.*

LADD, C. J., and DEEMER and WITHROW, JJ., concur.