J. W. Stewart & Son, Appellants, v. Chicago, Rock Island & Pacific Railway Company, Appellee.

**CARRIERS: Interstate Shipment—"Special" Service—Failure to**
1 **Ship.** Favoritism—special services—preferences, on interstate shipments, being unlawful, will not support an action. (Interstate Commerce Act, Feb. 4, 1887, c. 104, 24 Stat. at Large 379, as amended.) *Held*, whether a "special" service was contracted for depended on a question of fact for the jury.

PRINCIPLE APPLIED: The carrier had operated a stock train for ten years, on Sundays, Tuesdays and Thursdays, from points in Iowa to Chicago. It was termed an "extra", was not scheduled on the time tables, and occasionally was not run on Thursdays because of lack of freight, but this was exceptional. Shippers had relied on this train in shipping stock. Plaintiff contracted for a shipment of live stock on this Thursday train, but it did not run. Action for delay followed. Defense, that the shipper had attempted to contract for a "special" train—a special service. *Held*, whether the train was a regular train held out to all shippers on equal terms was for the jury. If it was a regular train, then no "special" service was contracted for.

**CARRIERS: Delay in Shipment—Avoiding Delay by Another Route**
2 **—Jury Question.** A shipment having failed to go forward on the regular train contemplated by the contract, whether plaintiff was negligent in not having shipped on another train or over another route, *held* question for the jury.

**CARRIERS: Interstate Shipments—"Discrimination" against Ship-**
3 **per—Waiver of Damages.** A discrimination against a shipper is one of the distinctive prohibitions of the Interstate Commerce Act. (32 Statutes at Large, p. 847, c. 708, U. S. Comp. St., Sup., 1911, p. 1308.) Provision of contract held to involve a discrimination.

PRINCIPLE APPLIED: The shipper contracted to have his stock go forward on a certain train. A delay of some three days

occurred, when a new contract was entered into and the stock went forward. In the latter contract was this clause: "That the second party hereby releases and waives any and all cause of action for damages that may have accrued to him by any written or verbal contract prior to the execution hereof." *Held,* to afford no protection to the carrier, as the clause was an unlawful discrimination.

CARRIERS: Station Agent—Authority—Furnishing Cars. It is within the authority of a station agent to arrange for all details in relation to furnishing cars and loading the same for transportation.

*Appeal from Keokuk District Court.*—K. E. WILLCOCKSON, Judge.

REHEARING DENIED MONDAY, OCTOBER 25, 1915.

ACTION for damages resulted in a directed verdict and judgment thereon. The plaintiff appeals.—*Reversed.*

*Stewart & Hextell,* for appellants.

*Stockman & Baker, F. W. Sargent, R. J. Bannister* and *J. H. Johnson,* for appellee.

LADD, J.—The plaintiff firm is engaged in the business of shipping stock from Keota to Chicago, Ill., and at about 3:30 o'clock P. M., April 19, 1912, ordered a car of defendant's local agent, in which to ship hogs, on the following morning at about 11 o'clock A. M., on the stock train. As there were cars on the sidetrack, the agent accepted the order, and plaintiff had enough hogs brought to the yards during the afternoon to make out a load. At about 7 o'clock P. M., the plaintiff was informed that the so-called stock train would not run the next day. It appears that the different station agents on the line from Valley Junction to Washington were required to report each day to the chief dispatcher at Des Moines the freight at their stations to be carried. The agent at Keota had reported that none was at that place, about an hour or

two before receiving the order, and had been notified by the chief dispatcher, shortly after the order of plaintiff, that the train would not run, but had been unable to get word to plaintiff until the time stated. At the time the chief dispatcher annulled the train, the reports from the several agents indicated that there was some dead but no live freight to haul. In the morning, plaintiff gave appropriate shipping orders, but was obliged to keep its stock in defendant's yards until the following Sunday, April 23d, when it was shipped to Chicago, and plaintiff claims as damages the cost of feeding and shrinkage in the meantime, and the loss in market price at Chicago. Cars leaving Keota at 11 o'clock A. M. ordinarily would reach the Union Stockyards in Chicago between 7 and 9 o'clock the following morning.

I. There was some controversy as to whether the stock train was a regular train for Sundays, Tuesdays and Thursdays. J. M. Stewart testified that the train had run on these days during the ten years previous and that shippers had relied on shipping their stock with it, and this was somewhat corroborated by the testimony of Augustine. Stewart admitted on rebuttal that at one time, at least, the train trip had been annulled, but also swore that at times it had hauled but one car of stock aside from dead freight. The evidence in behalf of defendant tended to show that the stock trains were not scheduled on the company's time card, that the train frequently did not run Thursdays, that a freight train on which the stock might have been shipped was due at Keota at 3:50 o'clock P. M. daily except Sundays and was due at Washington at 5 o'clock; that it left Keota at 5:15 o'clock, April 20th, and that a stock train left Washington at 1:25 o'clock A. M. every day for Chicago. The plaintiff contends that the failure to ship on April 20th was a breach of duty as a common carrier on defendant's part, and that there was an unreasonable delay in carrying the stock. The defendant sought to obviate this conclusion by insisting (1)

that the contract was for a special service; (2) that plaintiff should have shipped his hogs on the freight train scheduled to leave Keota at 3:50 o'clock in the afternoon; (3) that any damage plaintiff might have suffered was waived in the contract of shipment entered into on April 23rd, under which the hogs were transported to Chicago; and (4) that plaintiff should have ordered the car sooner, in order to enable defendant to operate its train on the day in question. These propositions will be disposed of in the order mentioned.

II. Though the stock train operated on defendant's road from Valley Junction through Keota, reaching the latter place at from 11 to 11:30 o'clock A. M. on Sundays, Tuesdays and Thursdays, was not scheduled on the defendant's time table, it had been run on these days during the ten years previous. That it was designated by the defendant an extra did not necessarily constitute it other than a regular train. According to evidence on the part of defendant, occasionally the train was not run on Thursday because of the lack of freight, but this was exceptional, and it was for the jury to say from the evidence whether the train was a regular train of the defendant road, and held out as such by the defendant to the shippers along the route. Of course, the evidence that reports were gathered from all the stations as to the amount of freight to be transported before the train was made up was a circumstance tending to support the defendant's theory that it was not operated unless there appeared to be sufficient freight to warrant the making up of the train; but, on the other hand, the testimony of two witnesses and of the station agent tend to show that rarely was the operation of the train annulled for any of these days. The issue as to whether it was a regular train and held out to shippers as such was for the jury. If, then, the train was one of those regularly operated over defendant's line, there is no ground for its contention that the order given for the car

1. CARRIERS: interstate shipment: "special" service: failure to ship.

and accepted with the full understanding that the carload of hogs should be taken at 11 o'clock on the following day was an engagement for a special service prohibited by the Interstate Commerce Act as amended. *Siemonsma v. Railway*, 158 Iowa 483; *Heilman & Clark v. Railway*, 167 Iowa 313.

III. A freight train was due at Keota at 3:50 o'clock P. M., going east, every day except Sundays; and though stock had never been shipped on this train, the evidence is uncontradicted that the plaintiff might thereby have shipped the carload of hogs through to Chicago, or to Washington, some 15 miles away, where it would have lain until about 1:30 o'clock the next morning and then been carried by a stock train on to Chicago. If this had been done, the hogs would have been sold on a better market than that on Friday previous. But, as said, this was not customary on defendant's road and was not called to the shipper's attention. Moreover, the time of the freight train was uncertain; sometimes, as the evidence shows, it did not pass Keota until after midnight. Moreover, the evidence tended to show that it would have been unsafe to ship stock at that time of the year through the middle of the day, owing to the heat, to the Chicago market, or to allow it to stand on the sidetrack between the time it would arrive at Washington and when it would be likely to be hauled from there by the stock train; for that, as the evidence showed, hogs being mixed in car and unaccustomed to each other would be likely to fight and crowd each other and pile up while the car would be standing; whereas, when in motion, their attention is attracted and they do not fight. In view of these conditions, it was for the jury to say whether the plaintiff, in the exercise of reasonable diligence, should have shipped his hogs on Thursday by way of the regular freight to Chicago or to Washington and on a stock train from that point.

**2. CARRIERS: delay in shipment: avoiding delay by another route: jury question.**

IV. The contract entered into by the parties hereto

on April 23d, under which the stock was shipped from

**3. CARRIERS: interstate shipments: "discrimination" against shipper: waiver of damages.**

Keota to Chicago, contained, among other things, the condition:

"That the second party hereby releases and waives any and all cause of action for damages that may have accrued to him by any written or verbal contract prior to the execution hereof."

And it is urged that thereby the plaintiff waived all claim to damages.

Such would be the consequence of this clause, were it valid. But including it in the contract necessarily involved a discrimination which is expressly forbidden by the act of Congress approved February 19, 1903, known as the Elkins Act, amending the act of 1887 (32 Statutes at Large, p. 847, c. 708, U. S. Comp. St. Sup. 1911, p. 1308), declaring it "unlawful for any person, persons, or corporation to offer, grant, or give, or to solicit, accept or receive any rebate, concession, or discrimination in respect of the transportation of any property in interstate or foreign commerce by any common carrier subject to said act to regulate commerce and the acts amendatory thereto, whereby any such property shall, by any device whatever, be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by said act to regulate commerce and the acts amendatory thereto, or whereby any other advantage is given or discrimination is practiced."

In the nature of things, damages which accrue from breaches of contracts such as here contemplated are different and vary in amounts. Necessarily, what shippers waive in executing such contract differs on each shipment; and on many, if not most, there are no damages to waive. If the contract for carriage exacted more in money or property for a like service from one person than from another, this constituted a discrimination, and we think such is the necessary consequence of inserting this clause in the contract. True,

all carriers are required to file with the Interstate Commerce Commission copies of contracts for shipment of different classes of freight, but neither this nor even the approval of the \Commission lends any sanctity to terms improperly inserted therein and contrary to the provisions of the laws enacted by Congress.

The defendant was required to file a schedule of rates of transportation with the Interstate Commerce Commission and prohibited from transporting property unless this were done, and it is to be presumed, from being actually engaged in carrying freight, to have performed this duty. See Sec. 2 of Act of Congress approved June 29, 1906 (34 U. S. Stat., page 586). It is not pretended that the release or waiver of prior damages accruing to the shipper is included in the tariffs scheduled, nor would such a thing be possible in advance; for the rates for like transportation of similar commodities must be the same, and damages to different shippers, such as contemplated in this clause, will seldom, if ever, be the same. The consequence is that, for one having no cause of action for breach of contract, property is carried at precisely the compensation charged another from whom is exacted, in addition thereto, the release of a valuable cause of action, or one more valuable than that of another shipper contracting for the carriage of the same class of freight. The discrimination is so manifest that the discussion need not be prolonged. The clause waiving or releasing any cause of action the shipper may have had is void.

V. Appellee insists further that, in any event, the company was entitled to longer notice of plaintiff's intention to ship the carload of hogs. The evidence was such that the jury might have found that the car was ordered the customary time in advance. Even if this were not so, it was competent for its local station agent to arrange for all details in relation to furnishing cars and loading and receiving the same for transportation. *Wood v. Railway,* 68 Iowa 491. Such an arrange-

4. CARRIERS: station agent: authority: furnishing cars.

ment was made; and before word that the train would not run the next day reached plaintiffs, they had caused the stock to be placed in the company's yards ready to load. The jury might well have found that the company refused to carry the property when agreed, and that, in not so doing, there was an unreasonable delay to plaintiff's damage. The cause should have gone to the jury.—*Reversed.*

DEEMER, C. J., GAYNOR and SALINGER, JJ., concur.